UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SANTA FE MEDICAL GROUP, LLC,    Case No. 15-11247 t

    Debtor.

PHILIP J. MONTOYA, Trustee,

    Plaintiff,

v.    Adv. No. 16-01051 t

RICHARD LIEBERMAN, M.D.,

    Defendant.

## **OPINION**

In this action, Plaintiff seeks to recover as fraudulent transfers $575,000 in pre-petition payments made by the debtor to Defendant. After a trial on the merits, the Court rules that the debtor did not receive reasonably equivalent value for the payments, and became insolvent by September 30, 2013. The Court also concludes that pre-judgment interest should be awarded from the date demand was made, at the current "Wall Street prime" rate. Based on these findings and conclusions, the Court will enter judgment in Plaintiff's favor for $452,093.75.

    I.    FACTS

The Court finds the following facts:[1]

---

[1] The Court took judicial notice of the docket in this bankruptcy case and in the federal and state court cases involving the parties. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket").

Santa Fe Medical Group, LLC ("SFMG") filed this chapter 11 bankruptcy case on May 14, 2015. The Court entered an order converting the case to chapter 7 on March 11, 2016. Philip J. Montoya was appointed the chapter 7 Trustee on March 17, 2016, in which capacity he continues to serve.

The Trustee brought this adversary proceeding on September 9, 2016, seeking avoidance of alleged fraudulent transfers under federal and state law.

SFMG was a healthcare provider, operating primarily in northern New Mexico. Its controlling and managing member was Philip D. Briggs, M.D. Defendant Richard Lieberman, M.D., is a medical doctor in Santa Fe, New Mexico. He worked for more than 20 years at St. Vincent's Hospital in Santa Fe. At different times Lieberman was the hospital's chief of staff and the director of the hospital's emergency services. After experiencing a major cardiac event and subsequent open heart surgery, Lieberman decided to resign from St. Vincent's. He met Briggs in 2003. Briggs asked Lieberman to start an urgent care division of SFMG.

On July 29, 2005, SFMG and Lieberman signed an admission agreement, which:

- Admitted Lieberman as a member of SFMG;
- Obligated Lieberman to manage SFMG's urgent care practice;
- Provided that the urgent care practice would be operated as a separate division;
- Obligated SFMG to pay Lieberman 50% of the net profits of the urgent care division; and
- Required both Lieberman's and Briggs' approval before changing Lieberman's position as the urgent care practice manager or his employment as an urgent care physician.[2]

Also on July 29, 2005, Lieberman and SFMG signed an Employment Agreement, under which SFMG employed Lieberman at a salary of $86.00 per hour. The agreement authorized

---

[2] Elsewhere, the agreement provides that "upon termination of the Employment Agreement in accordance with its terms, Dr. Lieberman shall withdraw from [SFMG] effective as of the effective date of the termination of the Employment Agreement." The employment agreement allows termination by either party without cause. Thus, the admission agreement is internally inconsistent.

SFMG to terminate Lieberman's employment for cause, and gave either party the right to terminate the agreement, with or without cause, on 30 days' notice.[3]

SFMG's urgent care practice was profitable between 2005 and 2013, during which time Lieberman's share of the net profits averaged about one million dollars per year.

On May 17, 2012, Lieberman was arrested in Albuquerque for soliciting a prostitute and possessing cocaine. Newspaper stories were published about the arrest in Albuquerque and Santa Fe. The publicity greatly concerned Briggs, who "locked out" Lieberman from SFMG shortly after the arrest. On September 18, 2012, Briggs sent Lieberman a termination letter, stating that his employment with SFMG would terminate on October 18, 2012. Lieberman was not allowed to work at or for SFMG after being locked out in May 2012.

Lieberman disputed SFMG's/Brigg's right to lock him out and terminate his employment. He demanded that Briggs pay him $750,000 a year for the next ten years, in exchange for Lieberman's membership interest in SFMG. Briggs refused the demand.

On November 21, 2012, SFMG, Briggs, and Lieberman, represented by counsel,[4] mediated the dispute. The mediation resulted in an agreement in principle, outlined by the mediator in an email to counsel sent the next day. There was significant post-mediation wrangling about some of the terms.[5] Finally, on April 12, 2013, Briggs, SFMG, and Lieberman signed a Settlement Agreement and Complete Mutual Release, pursuant to which SFMG agreed to pay $1,500,000 to Lieberman, in 60 monthly installments of $25,000. The first installment was due on April 10, 2013.

---

[3] Lieberman was paid very little under his employment agreement. Almost all of the money he made at SFMG was through his 50% share of the net profits of the urgent care division.

[4] Briggs and SFMG were represented by the same counsel. Further, the parties and the mediator styled the dispute "Lieberman v. Briggs." The documentary evidence gives the impression overall that both Briggs and Lieberman viewed the dispute as between them, rather than between Lieberman and SFMG.

[5] Of primary relevance to this dispute is that the mediator's email specified that Briggs would pay Lieberman, while the final settlement agreement required SFMG to do so.

The parties released one another from all claims. Further, Lieberman agreed to transfer to Briggs "any and all interest which he may have of whatsoever nature in SFMG and/or Urgent Care Santa Fe."

SFMG paid Lieberman as agreed between April 10, 2010, and the bankruptcy petition date. In total, SFMG paid Lieberman 23 installments of $25,000 (or $575,000).

On his federal income tax returns for 2013, 2014, and 2015, Lieberman took the position that the money he received from SFMG was a return of capital for his "Santa Fe Medical Group Membership Interest."

For some period of time after SFMG locked out Lieberman, SFMG's Urgent Care division continued to be profitable. However, mismanagement, improper billing, excessive distributions to members, and loans to money-losing affiliates caught up with SFMG. By September 30, 2013, SFMG had become insolvent. On May 14, 2015, SFMG's liabilities exceeded its assets by about $2,500,000.

On July 28, 2016, the Trustee's counsel sent a draft of a fraudulent transfer complaint to Lieberman's counsel. This clearly functioned as a demand for repayment of the $575,000.

The Court conducted a two day trial on the merits. The Trustee presented expert reports and expert testimony regarding the value of SFMG's fixed assets, accounts receivable, and other assets and liabilities. Lieberman did not present any of his own evidence about SFMG's financial condition, although his counsel cross-examined the Trustee's expert witnesses.

Attached as Exhibit A to this opinion is a spreadsheet of the Court's findings of fact about the value of SFMG's assets and liabilities each month between January 2013 and May 2015. The basis for the findings is discussed in Section C below, and is incorporated herein by reference.

## II. DISCUSSION

Trustee brings a claim under the federal fraudulent transfer statute, § 548(a)(1),[6] and New Mexico's fraudulent transfer statute, N.M.S.A. § 56-10-14 et seq. The Court's analysis focuses on § 548, rather than the state statute.[7]

A. § 548(a)(1)(B); Constructively Fraudulent Transfers.

Section 548 provides:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Section 548(a)(1)(B) permits the Trustee to set aside "so-called constructively fraudulent transfers." *BFP v. Resolution Trust. Corp.,* 511 U.S. 531, 535 (1994). The constructive fraud provision applies to transfers by insolvent debtors. *Id.* It permits avoidance if the debtor (1) had an interest in property; (2) transferred the interest within two years of the petition date; (3) was

---

[6] Unless otherwise indicated, all statutory citations are to 11 U.S.C.
[7] The outcome would be the same under the state statute.

insolvent when the transfer occurred or became insolvent as a result thereof; and (4) received less than reasonably equivalent value in exchange for the transfer. *Id. See also Weinman v. Walker (In re Adam Aircraft Indus.)*, 805 F.3d 888, 897 (10th Cir. 2015) (transfer is avoidable if, on the date of the transfer, the debtor did not receive reasonably equivalent value and was insolvent).

B.      § 548 (a)(1)(B)(i)--Reasonably Equivalent Value.

Value means "property, or satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2)(A). The Supreme Court has "counseled that § 548's 'reasonably equivalent value' inquiry asks 'whether the debtor has received value that is substantially comparable to the worth of the transferred property.'" *Adam Aircraft*, 805 F.3d at 897-98 citing *BFP*, 511 U.S. at 548. In this context, "reasonably equivalent" means approximately or roughly equivalent. *Id. quoting BFP*, 511 U.S. at 538 n. 4.

Here, the question is what SFMG received in exchange for its $25,000 monthly payments. Briggs, rather than SFMG, received Lieberman's interest in SFMG. Logically, Briggs should have paid for the interest, not SFMG. As confirmed by Lieberman's federal income tax returns, the real value in the settlement was received by Briggs (Lieberman's membership interest) and Lieberman (the cash payments). SFMG got little but the burden of paying Lieberman so Briggs could obtain Lieberman's SFMG membership interest.

It is true that Lieberman released all of his claims against SFMG. The claims, which were for 50% of the urgent care division's future net profits, likely had value. Had SFMG been released from its obligation to pay those future net profits, such a release could well have constituted reasonably equivalent value. As it was, however, SFMG's obligation was assigned to Briggs, and was not released.[8] Thus, the settlement saddled SFMG with a new obligation to pay $25,000 a

---

[8] As discussed below, SFMG's amended and restated operating agreement obligates SFMG to pay out all of its cash flow each year to its members

month, without relieving SFMG from its obligation to disburse all of its cash flow to members. SFMG's failure to receive reasonably equivalent value is demonstrated in part by its quick slide into insolvency after April 2013.

C.      § 548(a)(1)(B)(ii)(I); Insolvency[9]

"Insolvent" means:

[W]ith reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of--
    (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
    (ii) property that may be exempted from property of the estate under section 522 of this title;

§ 101(32)(A). This is commonly referred to as the "balance-sheet test."

Using SFMG's accounting information, the testimony of witnesses, and the Trustee's expert testimony about values, the Court constructed monthly SFMG balance sheets to determine when SFMG became insolvent. The Court's findings are in the attached Exhibit A. In arriving at the balance sheet estimates, the Court quantified and adjusted SFMG's medical accounts receivable; certain intercompany accounts receivable; and fixed assets. The Court also estimated the liability of certain claims against SFMG. The remaining asset and liability figures were taken without adjustment from SFMG's balance sheets.

    1.     Assets.

        a.    Medical Accounts Receivable. The medical accounts receivable were not listed on SFMG's balance sheets. The Trustee's expert valued the medical accounts receivable at

---

[9] § 548(a)(1(B)(2) includes tests other than insolvency, e.g., "unreasonably small capital" and "beyond the debtor's ability to pay as such debts matured." At trial, both the argument of counsel and the evidence focused on insolvency, however. The Court finds that the Trustee did not carry his burden of proving avoidability under subsection (II)-(IV) of § 548(a)(1)(B)(ii), or under the analogous provisions of the state statute (N.M.S.A. § 56-10-18(A)(2)(a) and (b)).

$1,800,000 on January 31, 2013; $1,700,000 on April 10, 2013; and $1,300,000 on December 31, 2013. Plaintiff's experts estimated a 86% collection rate for any medical receivables less than one year old. Medical accounts receivable more than one year old were deemed uncollectable. The expert also estimated a 15% cost of collection. Lieberman did not rebut the expert's method or analysis. The Court finds the expert's valuation of medical accounts receivable to be reasonable, and adopts it.[10]

      b.    <u>Atrinea Health Account Receivable</u>. An account receivable from Atrinea Health, LLC[11] was carried as an asset on SFMG's balance sheets. Between April 2013 and May 2015, the receivable fluctuated between $348,419 to $1,159,099.

Because of Atrinea Health's eventual bankruptcy, chronic insolvency, and history of losses,[12] the collectability of the Atrinea Health receivable is an obvious question. The Trustee's expert discounted the value of the receivable by $350,000 because of its doubtful collection. Lieberman did not offer an alternative valuation. In the Court's opinion, the proposed $350,000 discount is reasonable. The Court therefore values the Atrinea Health account receivable at its face value, less a $350,000 deduction for doubtful collection.

      c.    <u>Fixed Assets</u>. The Trustee's expert's valued SFMG's fixed assets at $740,000 in January 2013; $725,000 in March 2013, and $836,485 in December 2013. Lieberman

---

[10] Using $1,300,000 as the value of the medical accounts receivable after December 2013 probably overstates their value, because on the petition date the Debtor valued them at $763,922. Since it is the only number the Court has, however, it used $1,300,000.

[11] A New Mexico limited liability company owned by Briggs. Atrinea Health also filed a chapter 11 case in this court, on the same day as SFMG.

[12] Atrinea Health's balance sheet as of May 31, 2015, showed that liabilities exceeded assets by $735,396.84. Its 2010-2014 balance sheets show substantial losses every year except 2013, with a cumulative loss during those years of $2,385,840.79. The 2011-2014 balance sheets show substantial insolvency every year.

did not rebut the expert's valuation or provide an alternative valuation. The Court believes that the Trustee's expert's fixed asset valuation is reasonable and should be adopted.

2. <u>Liabilities</u>. Several liabilities were not reflected on SFMG's balance sheets, but should have been.

a. <u>Liability to Presbyterian Health Plan</u>. Presbyterian Health Plan ("PHP") filed a claim in this case for $3,480,148.75, based on alleged SFMG overbilling.[13] Starting in around July 2011, SFMG began billing PHP for certain services as though they had been provided by a temporary doctor, e.g., one who substitutes for a staff doctor out sick or on vacation. The PHP reimbursement rate is higher for temporary doctor services. The services billed for had not, in fact, been performed by a temporary doctor. Between July 2011 and September 2014, SFMG's bills that included improper temporary doctor billings totaled $3,480,148.75. However, the trial evidence showed that the bills were only about 15% too high, because the services billed for were actually rendered, only by a staff doctor rather than a temporary doctor. At a 15% overcharge rate, PHP's claim on the petition date would be $522,022.31, rather than $3,480,148.75. However, because the overbilling appears to have been intentional, and likely triggered potential penalties, interest, etc., the Court values the liability to PHP at 20% of the cumulative overcharged bills at a given time.

b. <u>Liability to Dr. McClees</u>. Dr. Robert McClees filed a proof of claim in this case for $340,000 in principal and $128,000 of interest, for a total of $468,000. His claim is based on emails offering to share profits with him (10% of the profit of the Los Alamos Urgent Care unit, and 25% of the profit of the Los Alamos Urgent Care x-ray department). After examining Dr.

---

[13] The bills to PHP were for medical services rendered to patients insured by the plan. SFMG was an approved provider of such medical services. SFMG billed PHP monthly for health care services provided to PHP members.

McClees' proof of claim and supporting documents, the Court finds that McClees' claim should be valued at $250,000.

           c.      <u>Liability to Dr. Williamson</u>. Dr. Ken Williamson filed a claim for $1,404,574.74. The claim is based on Williamson's 16-16% membership interest in SFMG, and SFMG third amended and restated operating agreement. Article IV, section 2 of the operating agreement provides that the cash flow of SFMG shall be determined each year and distributed to its members in proportion to their respective membership interests. That language is the basis for Williamson's claim. Williamson contend he received much less than the 16-18% he was due.

Other language in the operating agreement casts doubt on the claim, however. For example, Article IV, section 1 provides in part that SFMG's net profits and losses shall be allocated:

> To Ken Williamson, M.D., the following percentages of profits and losses from the practice of family medicine in any and all locations in Santa Fe County: (sixteen percent (16%) of profits and losses up to eight hundred thousand dollars ($800,000) per year; (b) eight and 89/100 percent (8.89%) of all profits in excess of eight hundred thousand dollars up to one million two hundred thousand dollars per year . . . .[14]

Thus, the operating agreement may be internally inconsistent. It would be unusual for Williamson (to give one example) to be allocated 4% of the net profits but 16% of the cash flow. Further, while the Court lacks evidence about the performance of SFMG's family medicine practice, it appears that the urgent care division generated most of SFMG's profits. Additionally, it is very possible that the family medicine practice participated in the wrongful billing to PHP, which would reduce its net profits. Lastly, Williamson's claim may be subject to an offset for SFMG's losses in 2013, 2014, and 2015. All of these potential defenses to the claim prompted the Court to value it at $50,000.

---

[14] Elsewhere the agreement says that family practice does not include provision of after-hours "urgent care" medical services without a scheduled appointment.

3. <u>Insolvency Date</u>. The Court's calculations based on the assets and liabilities discussed above show that SFMG became insolvent by September 30, 2013.[15]

4. <u>Avoidable Payments</u>. All 17 of the $25,000 payments SFMG made to Lieberman after September 30, 2013, are avoidable under § 548(a)(1)(B)(ii)(I). The total avoidable amount therefore is $425,000.

C. <u>Interest</u>.

The Trustee asked for prejudgment interest. Under federal law, prejudgment interest may generally be awarded if interest would compensate the injured party and the award is otherwise equitable. *Diamond v. Bakay (In re Bakay)*, 454 Fed. Appx. 652, 654 (10th Cir. 2011); *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 4 F.3d 1556, 1566 (10th Cir. 1993). Under federal law, prejudgment interest is ordinarily awarded, absent some justification for withholding it. *U.S. Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1256 (10th Cir.1988), *overruled on other grounds as recognized by Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1231 (10th Cir.1996); *In re Chong,* 523 B.R. 236, 253 (Bankr. D. Colo. 2014). An award of prejudgment interest is a matter within the trial court's discretion. *In re Sun,* 535 B.R. 358, 370 10th Cir. BAP 2015) (citing *U.S. Indus.*).[16] Prejudgment interest is not recoverable as a matter of right. *U.S. Indus.,* 854 F.2d at 1256. Instead, "awards of prejudgment interest are governed by fundamental considerations of fairness." *Id.* The trial court has the discretion whether to award interest from the date of the transfer or the date of the trustee's demand that the funds be returned. *In re Mercury Companies, Inc.*, 527 B.R. 438, 452-3 (D. Colo. 2015). The trial court also has the discretion to select a

---

[15] The Court will disregard SFMG's one-month insolvency in April 2013, because that was the month before the urgent care division was integrated with the rest of SFMG. After the May 2013 integration, several intercompany liabilities disappeared.

[16] *See also* N.M.S.A. § 56-8-4(B) (the trial court has discretion to award prejudgment interest of up to 10%, accruing from the date the complaint was served).

reasonable rate of interest, unless one is mandated by statute. *See In re Bridgeview Aerosol, LLC*, 538 B.R. 477, 514 (Bankr. N.D. Ill. 2015) (awards prejudgment interest at the prime rate, citing *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989).

Here, the Court finds and concludes that it would be fair and equitable to award the Trustee prejudgment interest. The Court further finds and concludes that a reasonable rate of interest would be the current "Wall Street prime" rate of 4.50%. Finally, the Court finds and concludes that the proper date for prejudgment interest to begin to accrue is August 1, 2016, the date the Trustee made demand on Lieberman to return the disputed payments. About 17 months have elapsed between August 1, 2016 and January 1, 2018. The Court therefore will award prejudgment interest of $27,093.75 (17 months x $1,593.75 (the monthly interest accrual on $425,000 at 4.5%)).

### III. CONCLUSION

SFMG did not receive reasonably equivalent value for the 17 payments of $25,000 it made to Lieberman after September 30, 2013, the date of SFMG's insolvency. The Trustee can recover the $425,000 under § 548(a)(1)(B)(ii)(I). Further, the Court will award prejudgment interest at the rate of 4.50% from August 1, 2016. The Court therefore will enter a separate judgment against Lieberman for $452,093.75.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: January 4, 2018

Copies to: counsel of record

**EXHIBIT A**
SFMG Adjusted Assets, Liabilities, and Net Worth

| Month | Adjusted Assets | Adjusted Liabilities | Adjusted Net Worth |
|---|---|---|---|
| 1/13 | $3,257,420 | $1,674,774 | $1,582,646 |
| 2/13 | $3,395,639 | $1,888,370 | $1,507,269 |
| 3/13 | $3,533,087 | $2,116,285 | $1,416,802 |
| 4/13 | $3,465,196 | $3,627,173 | $(161,977) |
| 5/13 | $3,414,431 | $2,612,968 | $801,463 |
| 6/13 | $3,285,055 | $2,677,030 | $608,025 |
| 7/13 | $3,237,447 | $2,695,850 | $541,597 |
| 8/13 | $3,000,143 | $2,767,552 | $232,591 |
| 9/13 | $2,754,644 | $2,838,376 | $(83,732) |
| 10/13 | $2,615,086 | $3,216,493 | $(601,407 |
| 11/13 | $2,722,859 | $3,336,785 | $(613,926) |
| 12/13 | $2,450,843 | $3,480,622 | $(1,029,779) |
| 1/14 | $2,402,142 | $3,431,733 | $(1,029,591) |
| 2/14 | $2,364,142 | $3,440,126 | $(1,075,984) |
| 3/14 | $2,450,512 | $3,496,338 | $(1,045,826) |
| 4/14 | $2,549,400 | $3,705,787 | $(1,156,387) |
| 5/14 | $2,529,805 | $3,679,753 | $(1,149,948) |
| 6/14 | $2,689,528 | $3,726,535 | $(1,037,007) |
| 7/14 | $2,658,522 | $3,847,657 | $(1,189,135) |
| 8/14 | $2,627,182 | $4,017,266 | $(1,390,084) |
| 9/14 | $3,544,453 | $5,034,875 | $(1,490,422) |
| 10/14 | $3,488,595 | $5,080,562 | $(1,591,967) |
| 11/14 | $3,376,185 | $5,136,263 | $(1,760,078) |
| 12/14 | $3,231,417 | $5,441,807 | $(2,210,390) |
| 1/15 | $3,062,757 | $5,309,488 | $(2,246,731) |
| 2/15 | $3,133,896 | $5,435,752 | $(2,301,856) |
| 3/15 | $3,279,818 | $5,446,486 | $(2,166,668) |
| 4/15 | $3,219,837 | $5,493,954 | $(2,274,117) |
| 5/15 | $1,180,947 | $3,594,919 | $(2,413,972) |

SFMG Adjusted Assets

| Month | Medical A/R | Atrinea Health A/R | Fixed Assets | Other Assets | Total Assets |
|---|---|---|---|---|---|
| 1/13 | $1,800,000 | $470,368 | $740,000 | $247,052 | $3,257,420 |
| 2/13 | $1,766,000 | $584,668 | $740,000 | $304,971 | $3,395,639 |
| 3/13 | $1,733,000 | $725,835 | $740,000 | $334,252 | $3,533,087 |
| 4/13 | $1,700,000 | $809,100 | $725,000 | $231,095 | $3,465,196 |
| 5/13 | $1,690,000 | $741,579 | $725,000 | $257,852 | $3,414,431 |
| 6/13 | $1,680,000 | $604,935 | $725,000 | $275,120 | $3,285,055 |
| 7/13 | $1,670,000 | $495,576 | $725,000 | $346,870 | $3,237,447 |
| 8/13 | $1,660,000 | $480,031 | $725,000 | $135,113 | $3,000,143 |
| 9/13 | $1,650,000 | $11,830 | $725,000 | $367,814 | $2,754,644 |
| 10/13 | $1,640,000 | $_____ | $725,000 | $250,086 | $2,615,086 |
| 11/13 | $1,620,000 | $102,762 | $725,000 | $275,096 | $2,722,859 |
| 12/13 | $1,300,000 | $77,564 | $836,485 | $236,795 | $2,450,843 |
| 1/14 | $1,300,000 | $158,851 | $836,485 | $106,806 | $2,402,142 |
| 2/14 | $1,300,000 | $137,318 | $836,485 | $90,339 | $2,364,142 |
| 3/14 | $1,300,000 | $227,428 | $836,485 | $86,599 | $2,450,512 |
| 4/14 | $1,300,000 | $271,142 | $836,485 | $141,773 | $2,549,400 |
| 5/14 | $1,300,000 | $299,155 | $836,485 | $94,165 | $2,529,805 |
| 6/14 | $1,300,000 | $376,506 | $836,485 | $176,537 | $2,689,528 |
| 7/14 | $1,300,000 | $392,654 | $836,485 | $129,383 | $2,658,522 |
| 8/14 | $1,300,000 | $406,128 | $836,485 | $84,569 | $2,627,182 |
| 9/14 | $1,300,000 | $425,617 | $836,485 | $982,351 | $3,544,453 |
| 10/14 | $1,300,000 | $428,117 | $836,485 | $923,993 | $3,488,595 |
| 11/14 | $1,300,000 | $441,713 | $836,485 | $797,987 | $3,376,185 |
| 12/14 | $1,300,000 | $287,790 | $836,485 | $807,143 | $3,231,417 |
| 1/15 | $1,300,000 | $282,656 | $836,485 | $643,615 | $3,062,757 |
| 2/15 | $1,300,000 | $301,292 | $836,485 | $696,119 | $3,133,896 |
| 3/15 | $1,300,000 | $315,684 | $836,485 | $827,649 | $3,279,818 |
| 4/15 | $1,300,000 | $310,805 | $836,485 | $772,546 | $3,219,837 |
| 5/15 | $1,300,000 | $(350,000) | $836,485 | $(605,538) | $1,180,947 |

## SFMG Adjusted Liabilities

| Month | Lieberman Liability | PHP Claim | Williamson and McClees claims | Other Liabilities | Total Liabilities |
|---|---|---|---|---|---|
| 1/13 |  | $254,719 | $300,000 | $1,120,055 | $1,674,774 |
| 2/13 |  | $287,101 | $300,000 | $1,301,269 | $1,888,370 |
| 3/13 |  | $310,531 | $300,000 | $1,505,754 | $2,116,285 |
| 4/13 | $1,400,000 | $340,653 | $300,000 | $1,586,520 | $3,627,173 |
| 5/13 | $1,375,000 | $362,069 | $300,000 | $575,899 | $2,612,968 |
| 6/13 | $1,350,000 | $383,651 | $300,000 | $643,379 | $2,677,030 |
| 7/13 | $1,325,000 | $399,726 | $300,000 | $671,124 | $2,695,850 |
| 8/13 | $1,325,000 | $415,450 | $300,000 | $727,102 | $2,767,552 |
| 9/13 | $1,300,000 | $443,753 | $300,000 | $794,623 | $2,838,376 |
| 10/13 | $1,275,000 | $460,573 | $300,000 | $1,180,920 | $3,216,493 |
| 11/13 | $1,250,000 | $486,725 | $300,000 | $1,300,061 | $3,336,785 |
| 12/13 | $1,225,000 | $506,938 | $300,000 | $1,448,684 | $3,480,622 |
| 1/14 | $1,200,000 | $532,097 | $300,000 | $1,399,636 | $3,431,733 |
| 2/14 | $1,175,000 | $558,966 | $300,000 | $1,406,160 | $3,440,126 |
| 3/14 | $1,150,000 | $583,334 | $300,000 | $1,463,004 | $3,496,338 |
| 4/14 | $1,125,000 | $599,217 | $300,000 | $1,681,570 | $3,705,787 |
| 5/14 | $1,100,000 | $620,841 | $300,000 | $1,658,913 | $3,679,753 |
| 6/14 | $1,075,000 | $642,590 | $300,000 | $1,708,945 | $3,726,535 |
| 7/14 | $1,050,000 | $662,563 | $300,000 | $1,835,094 | $3,847,657 |
| 8/14 | $1,025,000 | $679,513 | $300,000 | $2,012,753 | $4,017,266 |
| 9/14 | $1,000,000 | $690,645 | $300,000 | $3,044,230 | $5,034,875 |
| 10/14 | $975,000 | $693,918 | $300,000 | $3,111,644 | $5,080,562 |
| 11/14 | $950,000 | $694,424 | $300,000 | $3,191,840 | $5,136,263 |
| 12/14 | $925,000 | $694,830 | $300,000 | $3,521,977 | $5,441,807 |
| 1/15 | $900,000 | $695,280 | $300,000 | $3,414,208 | $5,309,488 |
| 2/15 | $875,000 | $695,588 | $300,000 | $3,565,164 | $5,435,752 |
| 3/15 | $875,000 | $695,890 | $300,000 | $3,575,597 | $5,446,486 |
| 4/15 | $875,000 | $696,010 | $300,000 | $3,622,945 | $5,493,954 |
| 5/15 | $875,000 | $696,030 | $300,000 | $1,723,889 | $3,594,919 |